**LYNCH CARPENTER, LLP**
GARY F. LYNCH
Pa ID No. 56887
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
T: (412) 322-9243
gary@lcllp.com

**DWOSKIN WASDIN LLP**
Eric S. Dwoskin
(*pro hac vice* forthcoming)
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Tel.: (561) 849-8060
edwoskin@dwowas.com

*Attorneys for Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JEFFREY PARKER, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>BARCLAYS BANK DELAWARE,<br><br>Defendant. | Civil Action No. 2:25-cv-02217-GJP<br><br>**JURY TRIAL DEMANDED** |

# AMENDED CLASS ACTION COMPLAINT

Plaintiff Jeffrey Parker ("Plaintiff"), on behalf of himself and all other similarly situated (the "Class Members"), brings this case against Barclays Bank Delaware ("Barclays" or "Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## INTRODUCTION

1. This is a class action against Barclays for violating Plaintiff's privacy rights under federal and state law by disclosing Plaintiff's and other consumers' personal financial information to third parties without consent.

2. Barclays operates a website—https://cards.barclaycardus.com/—on which consumers can apply for credit cards and other financial products. Barclays tracks and records its customers' interaction with its website, including after its customers have applied for a credit card on its website and including when a credit card holder accesses their account information after logging into the Barclays web portal.

3. In addition to tracking and recording its customers' interactions with its website, Barclays also incorporated a hidden tracking code created by third-parties into its website. This tracking code shares customer interactions with Barclays' website with the third-party technology vendor. Those vendors then use the data shared by Barclays to create custom audiences for Barclays to use for marketing and to benefit the vendors themselves.

4. The data Barclays shares with the vendors via the tracking technology includes time-stamped, personally identifiable records of Barclays customers, such as Plaintiff and other class members, including, among other things: information the consumer provides to Barclays,

including information related to an application to obtain a credit card or other financial product or service, and information Barclays obtains in connection with servicing its customers' accounts.

5. The vendors combine this personal information with other information about each consumer gathered from other sources and uses it for marketing and advertising purposes.

6. Under the Gramm–Leach–Bliley Act (GLBA), 15 U.S.C. §§ 6801, *et seq*., financial institutions, such as Barclays, are prohibited from disclosing a consumer's "personally identifiable financial information" without advance notification and opt-out rights. The GLBA defines "personally identifiable financial information" to include, among other things, (a) any information a consumer provides to a financial institution to obtain a financial products or service; (b) any information about a consumer resulting from any transaction involving a financial product or service; or (c) any information a financial institution otherwise obtains about a customer in connection with providing a financial product or service. The examples of "personally identifiable financial information" included in the GLBA are indistinguishable from the types of information Barclays disclosed to Adobe, including, among other things: (a) "[t]he fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution]"; (b) "[a]ny information that a consumer provides to [a financial institution] or that [a financial institution] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account; and (c) "any information [a financial institution] collect[s] through an Internet 'cookie' (an information collecting device from a web server)."

7. Barclays' practice of disclosing its customers' personal financial information to third-party technology vendors violated Plaintiff's and other class members' privacy rights under the GLBA. Barclays' conduct also violated other related federal and state laws. Plaintiff brings

this action, individually and on behalf of all others similarly situated, for damages and equitable relief.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq*.

9. This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of Defendant.

10. Venue is appropriate in this District pursuant to 28 U.S.C. §1391 because, upon information and belief, (a) Defendant does business in this District, (b) a substantial part of the events or omissions giving rise to the claim occurred in or emanated from this District, and (c) Defendant is subject to personal jurisdiction in this District.

11. The Court has personal jurisdiction over Barclays because Plaintiff's claims against it arise out of its conduct within Pennsylvania, including Plaintiff's use in Pennsylvania of the Barclays website to apply for financial products.

a. As a part of its regular course of business, Barclays targets Pennsylvania consumers to extract, collect, maintain, distribute, and exploit for its own profit, not only the Pennsylvania consumers' financial information that it diverts to its own servers, but also all of the other personal identifying information that it extracts from the tracking technology it places on their devices without their knowledge or consent;

b. Barclays generates substantial profits from Pennsylvania consumers;

c. Barclays knows about its Pennsylvania consumer base, conducts its regular business in Pennsylvania, contacts Pennsylvania residents, interacts with them as an intermediary for merchants within its payments network, installs its software onto their devices in Pennsylvania, and continues to track their activities from there;

d. Barclays invited Plaintiff in Pennsylvania to apply for financial products, including credit cards, from Barclays' website;

e. Plaintiff applied for a credit card using Barclays' website from Pennsylvania, which included providing personal and financial information to Barclays to obtain his credit card;

f. Barclays knew that Plaintiff resided in Pennsylvania when he applied for a credit card from Pennsylvania;

g. Barclays planned to perform part of its obligations under the credit card in Pennsylvania, including shipping Plaintiff a credit card, had he been approved for a credit card and making available funds for his personal use in Pennsylvania;

h. Barclays communicated its rejection of Plaintiff's credit card application to Plaintiff in Pennsylvania;

i. Barclays deployed cookies, including Adobe cookies, on Plaintiff's computer in Pennsylvania;

j. Barclays had Plaintiff's Pennsylvania IP address prior to deploying cookies, including Adobe cookies, on Plaintiff's computer in Pennsylvania;

k. Barclays aimed to place cookies on Plaintiff's computer in Pennsylvania, including cookies used by Adobe to facilitate targeting Plaintiff with advertising in Pennsylvania;

l. Plaintiff's personal financial information was shared with third-parties including via Adobe cookies, from his computer in Pennsylvania;

m. Barclays did not obtain, and Plaintiff did not give, his consent to this sharing of his personal financial information with third-parties, including Adobe, from Pennsylvania;

n. Barclays used the financial information that was collected from Plaintiff in Pennsylvania, including via Adobe cookies, to target Plaintiff with ads in Pennsylvania;

o. Plaintiff received email in Pennsylvania related to credit inquiries initiated by Barclays related to his credit card information.

## DEFENDANT

12. Barclays has its principal place of business in Wilmington, Delaware and is a financial institution, as that term is defined by Section 509(3)(A) of the GLBA, 15 U.S.C. § 6809(3)(A).

## NAMED PLAINTIFF

13. Plaintiff Jeffrey Parker is a resident of Philadelphia, Pennsylvania. During the last three years, Barclays invited Plaintiff to apply for a credit card through Barclays' website: https://cards.barclaycardus.com/ from his computer in Pennsylvania. Plaintiff applied for a credit card through Barclays' website: https://cards.barclaycardus.com/ from his computer in Pennsylvania and provided personal and financial information to Barclays on its website from his

computer in Pennsylvania. Barclays communicated that Plaintiff's credit card application was denied to him in Pennsylvania. Through the systematic data sharing process described in this complaint, at the time that Plaintiff applied for a credit card through Barclays' website, Barclays placed tracking technology on Plaintiff's computer in Pennsylvania. At that time, Plaintiff's interactions with Barclays' online financial platform were disclosed to third party technology vendors, such as Adobe, from his computer in Pennsylvania. In particular, Barclays disclosed (a) Plaintiff is a Barclays' customer or had obtained a Barclays' service, including that he applied for a credit card and the specific credit card Plaintiff submitted an application for; (b) information from Plaintiff that Plaintiff provided to Barclays in connection with his credit card application; and (c) information Barclays collected through Adobe internet cookies. Plaintiff did not consent to those disclosures in Pennsylvania. Plaintiff would have applied for a credit card with another bank had he known Barclays would share his personal information with third party technology vendors. Shortly after Plaintiff applied for a credit card through Barclays' website, Plaintiff noticed targeted advertising from Defendant related to financial products and services from his computer in Pennsylvania, including Facebook advertisements for Barclays credit cards but also for other credit cards too.

## FACTUAL ALLEGATIONS

### A. *Background on Web Browsers, Source Code, & Tracking Pixels.*

14. Web browsers are software applications that allow consumers to exchange electronic communications over the Internet.

15. Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with Internet users via their web browsers.

16. When an individual uses a web browser to navigate to a website, a number of communications occur between the user's computer and the server that hosts the website. The messages between the user's computer and the server that hosts the website include the following contents:

a. *A "GET request" sent from the user's computer to the website server, and a responsive "POST" request sent from the website server to the user's computer* When an individual internet user visits a web page, his or her web browser sends a message called a "GET request" to the webpage's server. The GET request tells the website what information is being requested and then instructs the website to send the information back to the web browser on the user's computer, which the website does via a responsive "POST request" sent to the users' web browser. The GET and POST requests include the content the user requested the website to display.

b. *The URL*. The uniform resource locator, or URL, is the location of the requested content on the web server. The URL of a webpage is typically shown in the address bar of the user's browser. URLs often use plain language to describe the associated content (*e.g.*, www.website.com/descriptionofcontentonpage).

c. *The IP address of the user's connection to the internet.* IP stands for "Internet Protocol." When connected to the Internet, each device is assigned a unique IP address by the Internet Service Provider ("ISP") that is providing the internet connection. IP addresses may change over time but often do not. In many cases, an ISP will continue to assign the same IP address to the same device.

d. *Information on the User Agent*. A user agent is the hardware and/or software responsible for retrieving the requested content, such as the device, operating system and web browser.

e. *A Timestamp*. A timestamp is the time of a request or event that a computer records. The timestamp displays when certain information was requested or exchanged.

17. The set of instructions that commands the browser is called the source code. In addition to exchanging the above communications with users' computers, websites can also cause tracking technologies (often referred to as "cookies" or "tracking pixels") to be installed on the accessing users' computer. These technologies are small files that the website places on the user's web browser to collect data about the user's online activity. These technologies work by assigning or associating the user with a unique identifier, storing that identifier with other information about the user (*e.g.*, geographic location, device specifications, etc), gathering data on the user's activity on the website in real time, and transmitting that data to the host website and the third-party technology vendor. Two of the primary reasons website operators use these technologies is to (a) track user's activity on the website; and (b) enable the website host to subsequently serve the website user with targeted advertising across the internet.

18. By directing user's data, activity, and communications with the website to third-party technology vendors, these technologies effectively open a spying window through which a website funnels data about users and their actions to third parties in real time.

19. Tracking technologies are installed by web developers on pages of the websites they host that are run on the host's servers.

20. When a user accesses a website that has tracking technology, the website deploys tracking technology onto the web browser on the user's computer in the location in which the

computer is located (in this case, in Pennsylvania). Due to the prior transmission of a device's IP address, when the website deploys tracking technology onto the web browser on the user's computer in the location in which the computer is located (in this case, in Pennsylvania), the website knows in advance that the device is located in a area with an IP address in Pennsylvania.

21. The third parties to whom the website transmits data through the tracking technology do not provide any substantive content relating to the user's communications. Instead, these third party tracking technologies are typically configured to track user data and communications for marketing and other pecuniary purposes.

22. Thus, without any knowledge, authorization, or action by a user, a website developer like Barclays can use its source code to commandeer the user's computing device, causing the device to contemporaneously in real time and invisibly re-direct the users' personally identifiable guest records and communications to third parties like Adobe.

23. When a user accesses a website hosting a tracking technology, the tracking technology is surreptitiously installed on the user's computer and thereafter directs the user's browser to transmit the users' communications with the website to the third-party technology provider (in this case, in Pennsylvania).

24. This secret transmission to the third-party technology provider contains the communications exchanged between the website user and the host website (*e.g.*, the "GET request" and a "POST request"), along with additional data that the tracking technology is configured to collect (*e.g.*, unique identifiers that allow the technology providers to associate the collected data with the individual website user).

25. The communications transmitted to the third-party technology vendor include those contents described herein, including the GET and POST requests, the webpage's Universal Resource Locator ("URL") and metadata, and user IP address.

26. This transmission is initiated by a tracking tool's code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read the host website—the website host's own code (which communicates with the user's web browser to deliver the requested web content), and a tracking tool's embedded code (which captures those communications and combines them with other information about and identifying the user).

27. Once the third-party technology vendor collects the information contained in the website user's communications with the host website, the third-party can store and use the information for various purposes of their own, including pecuniary purposes and facilitating targeted advertising.

28. On a technical level, that is how Barclays deployed Adobe's tracking technology on Plaintiff's and the Class's devices to intercept Plaintiff and the Class's communications with Barclays.

**B. Barclays' Website and Adobe Tracking Technology**

29. Barclays has integrated the Adobe Tracking Pixels into https://cards.barclaycardus.com/, including into its financial platform and online credit application process, and it is configured to transmit to Adobe: (a) information which identifies the specific consumer using Barclays' website; and (b) information about the actions the user takes on Barclays' website.

30. With respect to the Barclays customer's identity, the Barclays discloses to Adobe via the Adobe Tracking Pixels information captured by different cookies that identify the individual Barclays customer, including, upon information and belief, their email address.

31. With respect to the actions the Barclays customer takes on the Barclays website, Barclays discloses at least the following information alongside the information identifying the specific Barclays customer:

a. The Uniform Resource Locator ("URL") accessed, which shows what webpage the visitor visited. The Pixels transmit the entire path to Adobe, which includes the page of the financial platform or credit application to which the consumer has navigated. For instance, during a credit card application, those pages include URLs that describe the page the visitor has visited.

b. Adobe Audience Manager sends web-based audiences to Adobe for targeting. Adobe Audience Manager helps collect data from consumer interactions on websites, using "event calls." Such event calls include "click events" and "impression events." "A click event is when a user clicks or interacts with a Website element and an impression event is when a Website element is displayed to a user. Thus, Adobe Audience Manager is used to collect data such as gender, interests, housing type, location, promotion affinity, spending power, and more.

32. The data Barclays discloses to Adobe, jointly and independently, permit an ordinary person to identify the financial services the Barclays customer viewed, interacted with and/or purchased on Barclays' website.

33. Barclays benefits from using the Pixels because the Pixels help website owners and publishers, app developers and business partners, including advertisers and others integrate with Adobe, understand and measure their products and services, and better reach and serve people who might be interested in their products and services.

### C. The Information Barclays Shared Is Protected Under The Gramm-Leach-Bliley Act & Related Regulations.

34. The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

35. Barclays is a financial institution, as that term is defined by Section 509(3)(A) of the GLBA, 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

36. Pursuant to the GLBA, "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

37. Pursuant to the regulations implementing the GLBA:

a. "[n]onpublic personal information" means (i) "[p]ersonally identifiable financial information", and (ii) "[a]ny list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available", 16 C.F.R. § 313.3(n); 12 CFR § 1016.3(p);

b. "personally identifiable financial information," in turn, means "any information: (i) [a] consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution], (ii) [a]bout a consumer resulting from any transaction involving a financial product or

service between [a financial institution] and a consumer, or (iii) [a financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer," 16 C.F.R. § 313.3(o)(1); 12 CFR § 1016.3(q)(1); and

c. specifically enumerated "examples" of types of information that qualifies as "personally identifiable financial information" include, among other things: (i) "[t]he fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution," (ii) "[a]ny information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer," (iii) [a]ny information that a consumer provides to [a financial institution] or that [a financial institution] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account," and (iv) "[a]ny information [a financial institution] collect[s] through an Internet 'cookie' (an information collecting device from a web server)," 16 C.F.R. § 313.3(o)(2); 12 CFR § 1016.3(q)(2).

38. The information that Barclays disclosed to Adobe via the Adobe Tracking Pixels—including *e.g.*, the users' unique identifiers (which identified the user that was interacting with Barclays' financial services platform), the URL of the pages visited (which disclosed the financial services the user was obtaining), the identification of financial products a user applied for (which also disclosed the financial services the user was obtaining), and the "clicks" the user made on Barclays' website (which is information Barclays obtained from the consumer in connection with

providing financial products and services)—is "nonpublic personal information" under the GLBA and related regulations.

### D. Barclays' Disclosure Of Plaintiff's Nonpublic Personal Information Was Unlawful.

39. Pursuant to the regulations implementing the GLBA, financial institutions may not, directly or through an affiliate, disclose any "nonpublic personal information" about a consumer to a nonaffiliated third party unless, among other things: (a) the financial institution provides the consumer with a clear and conspicuous notice that accurately reflects the financial institution's privacy policies and practices; and (b) the consumer does not opt out of those data sharing practices and clear, conspicuous and accurate disclosure. 16 C.F.R. § 313.10(a)(1); 12 C.F.R. § 1016.10(a)(1).

40. As noted above, the notice to consumers regarding the financial institution's privacy policies and practices must be "clear and conspicuous" and "accurately reflect[]" the financial institutions privacy policies and practices. 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. The notice must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. The notice must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9.

41. Barclays fails to provide the required "clear and conspicuous" notice that "accurately reflects" its privacy policies and practices. In fact, Barclays' notice to consumers regarding its data sharing practices *falsely* states that: Barclays does not share personal information with non-affiliates so the non-affiliates can market to consumers.

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and non-financial companies.<br>▪ *Our affiliates include companies with a Barclays name* |
| **Non-affiliates** | Companies not related by common ownership or control. They can be financial and non-financial companies.<br>▪ *Barclays does not share with non-affiliates so they can market to you* |
| **Joint marketing** | A formal agreement between non-affiliated financial companies that together market financial products or services to you.<br>▪ *Our joint marketing partners include companies such as insurance companies* |

42. This statement is false because Barclays *does* share customers' personal information with Adobe so that Adobe can market to consumers. Within the meaning of the GLBA and related regulations, Adobe is not an affiliate of Barclays and is otherwise a nonaffiliate of Barclays. Because the Privacy Notice does not comply with applicable regulations described above, Barclays was prohibited from disclosing its customers' nonpublic personal information collected through the Adobe Tracking Pixel, and those disclosures were unlawful under the GLBA and related regulations.

43. By disclosing Plaintiff's and class members' nonpublic personal information to Adobe without the required notice, Barclays violated 16 C.F.R. § 313 (the "GLBA Privacy Rule") and 12 C.F.R. § 1016 ("Regulation P").

**E. Barclays' Conduct Was "Unfair" Under The Federal Trade Commission Act.**

44. The GLBA "Privacy Rule" became effective on July 1, 2001. 16 C.F.R. § 313.

45. The Federal Trade Commission ("FTC") has interpreted Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, to include compliance with the GLBA Privacy Rule.

46. Failing to comply with the GLBA Privacy Rule is an unfair act or practice prohibited by Section 5 of the FTC Act.

## CLASS ACTION ALLEGATIONS

47. Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff seeks certification of the following classes:

> **Nationwide Class:** All persons in the United States who, within the applicable limitations period, (1) applied for a financial product on Barclays' online financial platform at https://cards.barclaycardus.com/ or (2) accessed their account information on Barclays' online financial platform at https://cards.barclaycardus.com/.
>
> **Pennsylvania Subclass:** All persons in Pennsylvania who, within the applicable limitations period, (1) applied for a financial product on Barclays' online financial platform at https://cards.barclaycardus.com/ or (2) accessed their account information on Barclays' online financial platform at https://cards.barclaycardus.com/.
>
> **Multistate Subclass:** All persons in Connecticut, Delaware, Massachusetts, New Jersey, New York, and Vermont who, within the applicable limitations period, (1) applied for a financial product on Barclays' online financial platform at https://cards.barclaycardus.com/ or (2) accessed their account information on Barclays' online financial platform at https://cards.barclaycardus.com/.

Excluded from the classes are (a) Defendant, (b) any entity in which any Defendant has a controlling interest, (c) Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns, and (d) any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

48. Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

49. Each of the proposed classes meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

50. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Nationwide Class and each State Subclass are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of class members is unknown to Plaintiff at this time, Plaintiff believes that there are millions of members of the Class dispersed throughout the United States. Those persons' names and addresses are available from Barclays' records and in data maintained by Barclays and Adobe, and class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include electronic mail, U.S. Mail, internet notice, and/or published notice.

51. **Predominance of Common Issues. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual class members. The common questions include:

a. whether Defendant disclosed Class members' nonpublic personal information to Adobe;

b. whether Class members consented to Defendant's disclosure of their nonpublic personal information; and

a. Whether Defendant owed duties to Plaintiff and class members to protect their nonpublic personal information;

b. Whether Defendant breached its duty to protect Plaintiff's and class members' nonpublic personal information;

c. Whether Defendant's disclosure of Plaintiff's and class members' nonpublic personal information to third-parties violated federal, state and local laws, or industry standards;

d. Whether Defendant's conduct resulted in or was the actual cause of the disclosure of Plaintiff's and class members' nonpublic personal information;

e. Whether Defendant's conduct resulted in or was the proximate cause of the disclosure of Plaintiff's and class members' nonpublic personal information;

f. Whether Defendant has a contractual obligation to protect Plaintiff's and class members' nonpublic personal information and whether it complied with such contractual obligation;

g. Whether Defendant's conduct amounted to violations of state consumer protection statutes;

h. Whether Defendant should retain Plaintiff's and class members' valuable nonpublic personal information;

i. Whether, as a result of Defendant's conduct, Plaintiff and class members are entitled to injunctive, equitable, declaratory and/or other relief, and, if so, the nature of such relief.

52. **Typicality. Fed. R. Civ. P. 23(a)(3).** As to the Nationwide Class and each State Subclass, Plaintiff's claims are typical of other class members' claims because Plaintiff and class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

53. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Classes because Plaintiff is a member of the Classes and is committed to pursuing this matter against Defendant to obtain relief for the Classes. Plaintiff has no conflicts of interest with the Classes. Plaintiff's counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiff intends to

vigorously prosecute this case and will fairly and adequately protect the interests of all of the Classes.

54. **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual Plaintiff and class members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the class members are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each class member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

55. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Classes as a whole, making injunctive and declaratory relief appropriate to the Classes as a whole.

56. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

57. Finally, all members of the proposed Classes are readily ascertainable. Barclays has access to information regarding the identity of the individuals affected by the disclosure of their nonpublic personal information. Using this information, the members of the Classes can be identified and their contact information ascertained for purposes of providing notice to the Classes.

**COUNT 1**
**NEGLIGENCE**
On Behalf of Plaintiff and the Nationwide Class, or Alternatively, on Behalf of Plaintiff and the State Subclasses

58. Plaintiff repeats and realleges all preceding paragraphs.

59. Plaintiff and class members submitted sensitive nonpublic personal information, including personally identifiable financial information, when accessing Barclays' online financial platform.

60. By collecting, storing, using, and profiting from this data, Barclays had a duty of care to Plaintiff and class members to exercise reasonable care in keeping their nonpublic personal information, including personally identifiable financial information, confidential.

61. Barclays had common law duties to prevent foreseeable harm to Plaintiff and class members. These duties existed because Plaintiff and class members were the foreseeable and probable victims of any disclosure of their nonpublic personal information, including personally identifiable financial information, without their consent.

62. Defendant's duties to protect the confidentiality of Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, also arose as a result of the special relationship that existed between Defendant, on the one hand, and Plaintiff and class members, on the other hand. The special relationship arose because Plaintiff and class members entrusted Defendant with their nonpublic personal information, including personally identifiable financial information, in connection with using Defendant's financial services.

Defendant alone could have ensured that it did not disclose the nonpublic personal information, including personally identifiable financial information, without its consumers' consent.

63. Defendant's duties to keep the nonpublic personal information, including personally identifiable financial information, confidential also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including the unfair practice of failing to keep the nonpublic personal information confidential.

64. Barclays' duty to keep nonpublic personal information, including personally identifiable financial information, confidential also arose under the GLBA, under which Barclays was required to keep nonpublic personal information, including personally identifiable financial information, confidential.

65. Defendant's violation of Section 5 of the FTC Act (and similar state statutes) and the GLBA (and related regulations) constitutes negligence *per se*.

66. Defendant knew or should have known that by integrating the tracking technologies like the Adobe Tracking Pixels on Https://cards.barclaycardus.com/ that Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, would be disclosed to Adobe.

67. Defendant breached the duties it owed to Plaintiff and class members described above and was thus negligent. Defendant breached these duties by, among other things, installing the Adobe Tracking Pixels on its website, and configuring the Adobe Tracking Pixels in such a way that it systematically disclosed Defendant's customers nonpublic personal information, including personally identifiable financial information, to an unaffiliated third party.

68. But for Defendant's wrongful and negligent breach of the duties it owed to Plaintiff and class members, their nonpublic personal information, including personally identifiable financial information, would not have been disclosed without their consent.

69. As a direct and proximate result of Defendant's negligence, Plaintiff and class members have been injured and are entitled to damages in an amount to be proven at trial.

70. Plaintiff and class members seek to recover the value of the unauthorized access to their PII resulting from Defendant's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and class members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

**COUNT 2**
**UNJUST ENRICHMENT**
On Behalf of Plaintiff and the Nationwide Class, or Alternatively, on Behalf of Plaintiff and the State Subclasses

71. Plaintiff repeats and realleges all preceding paragraphs.

72. Plaintiff and class members have an interest, both equitable and legal, in the nonpublic personal information, including personally identifiable financial information, that was conferred upon, collected by, and maintained by Defendant and that was ultimately disclosed without their consent.

73. Defendant benefitted by its collection and improper disclosure of the nonpublic personal information, including personally identifiable financial information, pertaining to Plaintiff and class members and by its ability to retain, use, and profit from that information, including because the tracking technology at issue facilitated improvements of Defendant's website, to target advertising, and ultimately to increase their revenue and profits. Defendant understood that it was in fact so benefitted. There is a cost associated with using the tracking technology at issue that Defendant pays because it understands it benefits from using the tracking technology.

74. Defendant also understood and appreciated that the nonpublic personal information, including personally identifiable financial information, was private and confidential and that the information was valuable.

75. But for Defendant's willingness and commitment to maintain its privacy and confidentiality, the nonpublic personal information, including personally identifiable financial information, would not have been transferred to and entrusted with Defendant and/or Plaintiff and class members would not have interacted with Barclays' online financial platform.

76. Defendant continues to benefit and profit from its retention and use of the nonpublic personal information, including personally identifiable financial information, while its value to Plaintiff and class members has been diminished.

77. It is inequitable for Defendant to retain these benefits.

78. As a result of Defendant's wrongful conduct as alleged in this Complaint (including their knowing disclosure of Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, for marketing purposes that benefitted only Defendant) Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and class members.

79. Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, while at the same time disclosing that information to unaffiliated third parties for pecuniary purposes without consent.

80. Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits they received, and are still receiving, without justification, from Plaintiff and class members in an unfair and unconscionable manner. Defendant's retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

81. The benefits conferred upon, received, and enjoyed by Defendant were not conferred officiously or gratuitously, and it would be inequitable and unjust for Defendant to retain these benefits.

82. Plaintiff pleads this claim separately as well as in the alternative to claims for damages under Fed. R. Civ. P. 8(a)(3), because if the Court dismisses Plaintiff's claims for damages or enters judgment on them in favor of the Defendant, Plaintiff's will have no adequate legal remedy. Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in her other causes of action, in the event that such causes of action do not succeed. Plaintiff and the other members of the Classes may be unable to

obtain monetary, declaratory and/or injunctive relief directly under other causes of action, and, if so, will lack an adequate remedy at law.

83. Defendant is therefore liable to Plaintiff and class members for restitution or disgorgement in the amount of the benefit conferred on Defendant as a result of their wrongful conduct.

84. Plaintiff and class members seek to recover the value of the unauthorized access to their PII resulting from Defendant's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and class members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

## COUNT 3
## BREACH OF CONFIDENCE
On Behalf of Plaintiff and the Nationwide Class, or Alternatively, on Behalf of Plaintiff and the State Subclasses

85. Plaintiff repeats and realleges all preceding paragraphs.

86. At all times during Plaintiff's and class members' interactions with Barclays, Barclays was fully aware of the confidential and sensitive nature of Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information.

87. As alleged herein and above, Barclays' relationship with Plaintiff and class members was governed by terms and expectations that Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, would be collected, stored, and protected in confidence, and would not be disclosed to any third parties without notice and consent.

88. Plaintiff and class members provided their nonpublic personal information, including personally identifiable financial information, with the explicit and implicit understandings that Barclays would protect and not permit that information to be disseminated to unaffiliated third parties without notice and consent.

89. Barclays voluntarily received in confidence Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, with the understanding that and affirmative representation to customers that the information would not be disclosed or disseminated to unaffiliated third parties for marketing purposes.

90. Barclays disclosed Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, without notice and without their express permission.

91. But for Barclays' disclosure of Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, in violation of the parties' understanding of confidence, their nonpublic personal information, including personally identifiable financial information, would not have been disclosed third parties without their consent.

92. The injury and harm Plaintiff and class members suffered was the reasonably foreseeable result of Barclays' nonconsensual disclosure of Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information. Barclays knew it was disclosing Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, to third parties without their consent—indeed, Barclays' notice to its customers falsely stated that it would *not* make these disclosures.

93. As a direct and proximate result of Barclays' breaches of confidence, Plaintiff and class members have been injured and are entitled to damages in an amount to be proven at trial.

**COUNT 4**
**VIOLATION OF THE PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT, 18 PA. C.S. § 5701, *ET SEQ*.**
On behalf of Plaintiff and the Pennsylvania Subclass

94. Plaintiff repeats and realleges all preceding paragraphs.

95. Plaintiff brings this claim individually and on behalf of a Pennsylvania Subclass against Barclays.

96. The Pennsylvania Wiretap Act prohibits: (1) the intentional interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

97. Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Pennsylvania Wiretap Act is subject to a civil action for (1) actual damages, not less than liquidated

damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

98. "Intercept" means any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.

99. "Contents" means "any information concerning the substance, purport, or meaning of that communication." 18 Pa. Cons. Stat. § 5702.

100. "Person" means "any individual, partnership, association, joint stock company, trust or corporation." 18 Pa. Cons. Stat. § 5702.

101. "Electronic Communication" means "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. Cons. Stat. § 5702.

102. Because Barclays is a corporation, it is a person under the Pennsylvania Wiretap Act.

103. Tracking cookies are a "device" used for the "acquisition of the contents of any wire, electronic, or oral communication" under the Pennsylvania Wiretap Act.

104. Plaintiff and class members' intercepted web browsing are contents of electronic communications under the Pennsylvania Wiretap Act.

105. Defendant Barclays intentionally procures and embeds Adobe Tracking Pixels on its websites to secretly intercept its website visitors' electronic communications with its website in real time.

106. Plaintiff and class members' electronic communications are intercepted at the same time as their transmission.

107. Plaintiff and class members did not consent to having their website communications wiretapped.

108. Under the Pennsylvania Wiretap Act, Plaintiff and class members seek: (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

## COUNT 5
## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
## (73 PA. C.S. §201-1, ET ESQ.)
On behalf of Plaintiff and the Pennsylvania Subclass

109. Plaintiff repeats and realleges all preceding paragraphs.

110. Barclays, Plaintiff, and the Class members are "[p]erson[s]" within the meaning of 73 Pa. C.S. §201-2(2).

111. Plaintiff and the Class members applied for financial products or services "primarily for personal, family or household purposes" within the meaning of 73 Pa. C.S. §201-9.2(a).

112. Barclays was and is engaged in "[t]rade" or "commerce" within the meaning of 73 Pa. C.S. §201-2(3).

113. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 Pa. C.S. §201-3.

114. In the course of its business, Barclays, directly or through its agents, employees, and/or subsidiaries, violated the Pennsylvania CPL by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts relates to its financial products and services, namely, that it shares personal information with non-affiliates, which market to Barclays' credit applicants.

115. Specifically, by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts regarding its financial services and products, as detailed above, Barclays engaged in unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of the Pennsylvania CPL.

116. Barclays's misrepresentations and omissions regarding its financial services or products were disseminated to Plaintiff and the Class members in a uniform manner.

117. Barclays's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and suppressions of material facts, as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers about whether and under what circumstances Plaintiff's and Class members' personal information would be disclosed to non-affiliates, such as Adobe.

118. The facts regarding Barclays' financial services and products that Barclays knowingly and intentionally misrepresented, omitted, concealed, and failed to disclose would be considered material by a reasonable consumer, and they were, in fact, material to Plaintiff and the Class members, who consider such facts to be important to their decisions with respect to applying for credit products through Barclays.

119. Plaintiff and the Class members relied on Barclays's misrepresentations, omissions, and concealments.

120. Plaintiff and the Class members were aggrieved by Barclays's violations of the Pennsylvania CPL because they suffered ascertainable loss and actual damages as a direct and proximate result of Barclays's knowing and intentional misrepresentations, omissions, concealments, and failures to disclose material facts as set forth above.

121. Plaintiff's and class members' ascertainable loss includes the value of the unauthorized access to their PII resulting from Defendant's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and class members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

122. Barclays's violations present a continuing risk to Plaintiff and the Class members, as well as to the general public. Barclays's unlawful acts and practices complained of herein affect the public interest.

123. As a result of Barclays's violations of the Pennsylvania CPL, as alleged herein, Plaintiff and the Class members seek an order enjoining Barclays's unfair or deceptive acts or practices and awarding actual damages, costs, attorneys' fees, and any other just and proper relief available under the Pennsylvania CPL.

**COUNT 6**
**MUTLTISTATE UNFAIR AND DECEPTIVE TRADE PRACTICES**
On Behalf of Plaintiff and the Multistate Subclass(es)

124. Plaintiff, individually and on behalf of each State subclass, incorporates by reference the allegations in paragraphs 1 - 39.

125. This claim is brought by Plaintiff, individually and on behalf of the Multistate Subclass, for violations of the following consumer-protection statutes:

a. Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a through 42-110q.

b. Delaware Consumer Fraud Act, Del. Code Ann. tit. 6, §§ 2511 through 2527, 2580 through 2584.

c. Massachusetts Regulation of Business Practice and Consumer Protection Act, Mass. Gen. Laws Ann. ch. 93A, §§ 1 through 11.

d. New Jersey, N.J. Stat. Ann. §§ 56:8-1 through 56:8-91.

e. N.Y. Gen. Bus. Law §§ 349, *et seq.*

f. Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451 through 2480g.

126. The acts, practices, misrepresentations and omissions by Defendant described above, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes.

127. Defendant's acts and practices created a likelihood of confusion or of misunderstanding and misled, deceived or unfairly damaged Plaintiff and members of the Multistate Subclass. Defendant's conduct also constituted the use or employment of deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged in violation of each of the above-enumerated statutes.

128. Plaintiff and members of the Multistate Subclass have been injured and harmed by Defendant's conduct.

129. Plaintiff, on behalf of himself and the other members of the Multistate Subclass, seeks monetary damages, treble damages, statutory damages, and such other and further relief as set forth in each of the above enumerated statutes.

**COUNT 8**
**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT 18 U.S.C. § 2511(1) *et seq.***
**UNAUTHORIZED INTERCEPTION, USE AND DISCLOSURE**
On Behalf of Plaintiff and the Nationwide Class

130. Plaintiff, individually and on behalf of the Nationwide Class, incorporates the foregoing allegations as if fully set forth herein.

131. The Electronic Communications Privacy Act ("ECPA") protects both sending and receipt of communications.

132. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

133. The transmissions of the information described above to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

134. The transmissions of the information described above between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

135. The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

136. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

137. The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiff's and Class Members' browsers;

b. Plaintiff's and Class Members' computing devices (including mobile devices);

c. Defendant's web-servers;

d. Defendant's Website; and

e. The online tracking technologies deployed by Defendant to effectuate the sending and acquisition of information to third party marketing companies.

138. By utilizing and embedding the online tracking technologies on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

139. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the online tracking technologies, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' communications with Defendant's Website to the third party marketing companies described above.

140. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff's and Class Members' regarding their requests to Defendant about its products and services, including the vehicles and dealership locations they were browsing on Defendant's website.

141. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

142. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

143. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, and the various other laws identified in the counts above, among others.

144. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the online tracking technologies to track and utilize Plaintiff's and Class Members' personal data and communications for financial gain.

145. Defendant was not acting under color of law to intercept Plaintiff and Class Member's wire or electronic communication.

146. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the online tracking technologies Defendant deployed on their computers.

147. In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions, including as described above.

148. Plaintiff and Class members seek to recover the value of the unauthorized access to their data and communications resulting from Defendant's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty"

from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and Class members have a protectible property interest in their data and communications; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

149. Defendant's actions caused damage to and loss of Plaintiff's and Class members' property right to control the dissemination and use of their personal information.

150. As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages; preliminary and other equitable or declaratory relief as may be appropriate; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all Class Members, respectfully requests that the Court enter judgment in his favor and against Defendant as follows:

a. For an Order certifying the Classes, as defined herein, and appointing Plaintiff and Plaintiff's Counsel to represent the Classes as alleged herein;

b. For injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and class members, including but not limited to an order:

i. Prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. Requiring Defendant to protect all nonpublic personal information, including personally identifiable financial information, collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

c. For an award of compensatory, consequential, and general damages, including nominal damages, as allowed by law in an amount to be determined;

d. For an award of statutory damages, trebeled, and punitive or exemplary damages, as allowed by law in an amount to be determined;

e. For an award of restitution or disgorgement, in an amount to be determined;

f. For an award of attorneys' fees costs and litigation expenses, as allowable by law;

g. For prejudgment interest on all amounts awarded; and

h. Such other and further relief as this court may deem just and proper.

**JURY DEMAND**

Plaintiff, on behalf of himself and all others similarly situated, hereby demands a trial by jury on all issues so triable.

Date: June 23, 2025

GARY F. LYNCH
Pa ID No. 56887
**LYNCH CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
T: (412) 322-9243
gary@lcllp.com

Eric S. Dwoskin
(*pro hac vice* forthcoming)
**DWOSKIN WASDIN LLP**
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Tel.: (561) 849-8060
edwoskin@dwowas.com

*Attorneys for Plaintiff and the Putative Class*